MICHAEL CLIFT                )
                             )
v.                           )          1:06-cv-181\ 1:03-cr-95
                             )          *Edgar*
UNITED STATES OF AMERICA     )

## MEMORANDUM

Defendant Michael Clift ("Clift") filed a motion to vacate, set aside or correct his sentence pursuant to 28 U.S.C. § 2255 (Court File No. 1). Clift's sole claim is a claim of ineffective assistance of counsel based on the allegation that counsel failed to file a notice of appeal even though he instructed counsel to file a direct appeal from the sentence selected by the Court at his re-sentencing.[1] After reviewing the record and the government's response agreeing that Clift should be granted an out-of-time appeal, the Court concludes the § 2255 motion will be **GRANTED** and the Court will **VACATE** Clift's November 22, 2005 Amended Judgment (Crim. Court File No. 86), and **REIMPOSE** the same sentence, and enter a Second Amended Judgment.

**I.     Standard of Review**

A sentence in a criminal case must be vacated if the Court makes a finding "the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, . . . 28 U.S.C. § 2255. Under Rule 8 of the Rules Governing Section 2255 Proceedings in the United States

---

[1] On June 14, 2005, the court of appeals vacated Clift's sentence and remanded the case to this Court for re-sentencing in light of *United States v. Booker*, 543 U.S. 220 (2005).

1

District Courts, the Court is to determine after a review of the answer and the record whether an evidentiary hearing is required. If not, the district judge is to dispose of the case as justice dictates. The Court finds it is not necessary to hold an evidentiary hearing in the present case.

To warrant relief under 28 U.S.C. § 2255 because of constitutional error, the error must be one of constitutional magnitude which had a substantial and injurious effect or influence on the proceedings. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (citation omitted); *Clemmons v. Sowders*, 34 F.3d 352, 354 (6th Cir. 1994).

## II.     Procedural Background

Clift entered a plea of guilty without the benefit of a plea agreement to aiding and abetting possession with intent to distribute marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(D) and 18 U.S.C. § 2. (Court File No. 47). Clift was sentenced to a 60-month term of imprisonment (Court File No. 66). On October 27, 2003, Clift filed a notice of appeal from his sentence, and on June 14, 2005, the court of appeals vacated his sentence and remanded the case to this Court for re-sentencing in light of *Booker*. On November 14, 2005, Clift was sentenced under the advisory Guidelines to the same term of imprisonment of 60 months (Court File No. 86). On November 18, 2005, Clift sent a letter to the Clerk's office requesting copies of documents from his file stating he was filing a § 2255 motion for ineffective assistance of counsel (Crim. Court File No. 89).

Clift filed a *pro se* notice of appeal on January 23, 2006 (Court File No. 91), which was dismissed by the Sixth Circuit Court of Appeals on April 23, 2006, for lack of jurisdiction because Clift failed to file a timely notice (Court File No. 94). On August 15, 2006, Clift filed the instant § 2255 motion.

### III. Factual Background

The following factual background was taken from the Offense Conduct section of the Presentence Investigation Report ("PSI"):

13. During the 1990's Joel Sanchez lived in Cleveland, Tennessee, where he met co-conspirator Michael Clift. According to investigators, Mr. Clift met Mr. Sanchez when Sanchez was operating a Mexican restaurant in the Cleveland area. Around March of 2002, after Mr. Sanchez returned to California, he began shipping marijuana to Michael Clift in Tennessee and Clift would send back payments for the marijuana via Western Union wire transfers.

14. Michael Clift also developed a friendship with Shawn Rader, who is a chronic, long-term marijuana user. Mr. Clift provided quantities of Mr. Sanchez's marijuana to Mr. Rader, who would then re-distribute what he did not consume himself. In 2002, Clift asked Rader to rent a post office box at the Murray Lake Hills U.S. Post Office in the Chattanooga, Tennessee, area. (Clift had previously rented a box at the Benton, Tennessee, U.S. Post Office and postal records reveal that Mr. Sanchez had shipped several packages to him at that address.) Mr. Rader rented the box as instructed by Clift.

15. On December 20, 2002, the station manager at the Murray Lake Hills U.S. Post Office notified the U.S. Postal Inspector's Office that suspicious parcels addressed to "S.R. Siding" had been arriving at the station. The manager noted a pattern to the mailings and requested the assistance of the Postal Inspector's Office. When a postal inspector secured a narcotics dog, the dog alerted to the suspicious package. Pursuant to a search warrant, the postal inspector opened the package and discovered approximately four pounds of what later proved to be marijuana.

16. On December 21, 2002, the postal inspector arrested Michael Clift when he attempted to pick up the package. When he was questioned by law enforcement officials, Mr. Clift refused to sign a rights waiver and denied any knowledge of a marijuana shipment. He told agents that his friend Shawn Rader had gone out of town and had asked Clift to pick up his mail at the post office box while he was gone. Agents questioned Clift about a piece of paper in his wallet which bore an address on Van Nuys Boulevard in Panorama City, California. Mr. Clift said the address was that of his friend, Joel Sanchez, who lived in California. He further related that he had previously sent express mail packages to Mr. Sanchez, but he said the last one he sent (on December 19, 2002) contained only a Christmas card. Mr. Clift could not

explain why he had used the fictitious name "B.J. Smith" or the address "902 Nevin Lane, Cleveland, Tennessee" on the return address label for that package.

3

17.	In an interview with law enforcement on January 15, 2003, Michael Clift told agents that he bought and sold used cars for Joel Sanchez and he admitted he had sent money to Sanchez via the Postal Service. He told agents that he had used a fictitious name and a friend's address on the sender portion of the label because he had a previous arrest for receiving drugs through the mail.

18.	On January 29, 2003, the Murray Lake Hills Post Office manager noticed another suspicious package addressed to S.R. Siding and requested the assistance of the Postal Inspector's Office. A drug dog was brought over to sniff the package (along with other decoy packages) and the dog alerted to the package addressed to S.R. Siding. Inside the package, agents found what was later determined to be 897.4 grams (1.9 pounds) of marijuana.

19.	On January 30, 2003, Shawn Rader arrived at the Murray Lake Hills Post Office to retrieve the package and was arrested immediately thereafter. When he was interviewed by agents, he admitted he had rented the post office box at the Murray Lake Hills station, but advised he had done so at the behest of Michael Clift. He later admitted that Clift had asked him to rent the post office box because Clift had a prior arrest for receiving marijuana through the mail. According to Mr. Rader, Michael Clift was getting about two pounds of marijuana in each shipment and the shipments were coming from Joel Sanchez in California. Mr. Rader told agents that Mr. Clift was paying Sanchez about $700 per pound for marijuana, but Clift was reselling it to Rader for $1,100 per pound. Mr. Rader further related that Clift had instructed him on at least one occasion to send a payment to Sanchez for him via Western Union.

20.	The Postal Inspector's Office obtained a videotape of Mr. Sanchez as he mailed packages known to contain marijuana from California. He was also videotaped receiving a package containing $1,400, which represented payment for two pounds of marijuana. In an undercover operation, Postal Inspectors obtained marijuana from Sanchez on February 6, March 6, March 13 and March 27, 2003. Postal Inspectors have also recovered Express Mail labels on packages shipped to the Chicago, Illinois, area which bore the same fictitious names and the same handwriting as the packages of marijuana shipped to Tennessee.

21.	Records from Western Union indicate that, between January 4, 2001, and November 30, 2002, Sanchez received a total of $78,050 in wire transfers, with approximately $70,590 of that having come from the Chattanooga and Cleveland, Tennessee, areas. In addition, postal inspectors advise that the package Michael Clift mailed to Sanchez on December 19, 2002, contained a payment for at least two pounds of marijuana. Based on the information available, Mr. Sanchez was charging approximately $700 per pound for marijuana. Therefore, the evidence suggests that he had shipped at least 113.5 (51 kilograms) of marijuana from California [111.5 pounds extrapolated from wire transfers + 2 pounds extrapolated from Michael Clift's December 2002 express mail payment]. Of that, a total of 102.8 pounds (46.6

4

kilograms) was shipped to Tennessee [100.8 pounds extrapolated from wire transfers + 2 pounds extrapolated from Clift's December 2002 express mail payment].

22. Mr. Sanchez will be held accountable for the entire 51 kilograms of marijuana extrapolated from the wire transfer total, plus Clift's express mail payment. Mr. Clift and Mr. Rader will be held accountable for the 46.6 kilograms of marijuana for which payment was made via Western Union and via Clift's express mail package in December 2002.

(PSI, pp. 5-6).

## IV. Analysis

### A. *Ineffective Assistance of Counsel Claim for Failure to File an Appeal*

Clift claims he received ineffective assistance of counsel because he instructed counsel to file a direct appeal from the sentence he received at his re-sentencing hearing but counsel failed to do so. Observing that Clift was nearing the completion of his sentence at the time of the re-sentencing, and at the time he filed the instant motion he was in the custody of a halfway house, the government responded that a direct appeal from his sentence would have been be totally frivolous. Nevertheless, the government concluded that it would be easiest to give Clift an opportunity to file an out-of-time direct appeal from the sentence imposed by the Amended Judgment on November 22, 2005, if he chooses to do so, because, if he in fact directed his attorney to file a notice of appeal and counsel failed to do so, he would be entitled to relief. The government asserts that counsel is not available

to provide information to the Court as to his conversation with Clift regarding the filing of a notice of appeal.[2]

---

[2] The Court is accepting Clift's version of the facts since he has asserted these facts and the Government is unable to present counsel's version of the facts. In doing so, the Court recognizes these facts may not be accurate. By accepting Clift's version of the facts for purposes of this motion, the Court is not concluding counsel actually rendered ineffective assistance of

5

The United States Supreme Court has "long held that a lawyer who disregards specific instructions from the defendant to file a notice of appeal acts in a manner that is professionally unreasonable." *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000) (citing *Rodriquez v. United States*, 395 U.S. 327 (1969); *cf. Peguero v. United States*, 526 U.S. 23, 28 (1999)). Likewise, the law in the Sixth Circuit has long been that the failure to perfect a direct appeal, in derogation of a defendant's actual request, is a *per se* violation of the Sixth Amendment. *Ludwig v. United States*, 162 F.3d 456, 458 (6th Cir. 1998). "[A] defendant's actual 'request' is still a critical element in the Sixth Amendment analysis. The Constitution does not require lawyers to advise their clients of the right to appeal. Rather, the Constitution is only implicated when a defendant actually requests an appeal, and his counsel disregards the request." *Ludwig*, 162 F.3d at 459.

Clift filed his § 2255 motion under penalty of perjury averring he instructed counsel to file an appeal (Court File No. 1). Contrary to Clift's allegations, there was no mention in his November 28, 2005 letter to the Clerk, that he wished to file an appeal or inquire as to whether an appeal had been filed on his behalf. However, the Court does observe that, after he filed a late appeal, he sent a letter to the Clerk inquiring about his appeal and stating he had previously requested a docket sheet to see if his attorney filed his appeal (Court File No. 92). Although Clift did not inquire of the status of his appeal until after he filed his late notice of appeal, the Court observes that during his re-sentencing proceeding he expressed disagreement with the calculation of his advisory Guideline range and indicated an intent to appeal (Crim. Court File No. 98).

Of course, after the sentencing proceeding, counsel could have advised Clift that pursuing an appeal was frivolous, and they could have agreed that, due to the fact he would be released from

---

counsel.

custody in a short amount of time, an appeal should not be pursued. In addition, the Court observes that Clift filed a letter, dated four days after his re-sentencing, requesting documents from his criminal case so he could file a § 2255 motion for ineffective assistance of counsel. Clift made absolutely no mention in that letter of wishing to pursue a direct appeal until two months later when he filed a notice of appeal. Nevertheless, the government has offered no evidence to counter Clift's allegations.

Having reviewed the complete record of the underlying criminal case and the materials submitted in the instant § 2255 case, and giving Clift the benefit of the doubt, the Court concludes the Government has failed to show Clift did not request his counsel to file an appeal. Accordingly, since Clift's attorney is unavailable to provide information to the Court as to his conversations with him, Clift is entitled to relief.

**V.     Conclusion**

Clift's § 2255 motion will be **GRANTED** and he will be **GRANTED** an out-of-time appeal as the remedy for counsel's alleged failure to file an appeal. Therefore, the Court will **VACATE** Clift's November 22, 2005 Amended Judgment (Crim. Court File No. 86) and **REIMPOSE** the same sentence so the time for appeal can start to run again. *See Rosinski v. United States*, 459 F.2d 59 (6h Cir. 1972) (per curiam); *see also United States v. Phillips*, 225 F.3d 1198, 1201 (11th Cir. 2000). The Court **WILL ENTER** a Second Amended Judgment.

Clift has the right to appeal the reimposed sentence. The Court will order the Clerk's Office to file a notice of appeal for him within **Ten Days** from the entry of the Second Amended Judgment, in accordance with Fed.R.Crim.P 32(k). If Clift cannot afford counsel to represent him on appeal, he should complete the *in forma pauperis* application which the Clerk will mail him, and file it,

along with a motion requesting the Court to appoint counsel to represent him. The Clerk will be **ORDERED** to send Clift a copy of this Memorandum and the accompanying Judgment, and Second Amended Judgment to his residence c/o Sue Clift, at 5131 Lake Circle Drive, Cleveland, TN 37312.

An appropriate Judgment will enter.


                       */s/ R. Allan Edgar*
                          R. ALLAN EDGAR
                  UNITED STATES DISTRICT JUDGE